UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------x
MATTHEW RIZZUTO,

                                    Plaintiff,        Civ. A. No.:

        -against-                            **COMPLAINT**

BILL DE BLASIO, Individually and as Mayor of the
City of New York, THE CITY OF NEW YORK,
DAVID A. HANSEL, Individually and as Commissioner,    **JURY TRIAL**
City of New York Administration For Children's Services,  **DEMANDED**
CITY OF NEW YORK ADMINISTRATION FOR
CHILDREN'S SERVICES, SEYMOR W. JAMES, JR.,
Individually and as Attorney-In-Chief of The Legal Aid Society,
LEGAL AID SOCIETY, ROBERT J. MAHON,
Individually and as Executive Director SCO Family of Services,
SCO FAMILY OF SERVICES f/k/a
ST. CHRISTOPHER OTTILIE, SAMUEL ANTUPIT and
LORETTA ANTUPIT,

                                   Defendants.
-----------------------------------------------------------------------------x

        Donald N. Rizzuto, declares the following to be true:

### Parties and Jurisdiction

1.     Plaintiff Matthew Rizzuto (DOB: 10/01/1998) is a natural person permanently residing in

       the County of Nassau, State of New York (hereinafter "Plaintiff").

2.     Defendant Bill De Blasio as the mayor of the City of New York is the Chief

       Administrator responsible for all the municipal functions and development,

       implementation and enforcement of all policies of Defendant City of New York

       including, but not limited to Defendant City of New York Administration For Children's

       Services.

1

3.      At all times herein mentioned, defendant City of New York is a domestic municipal corporation with its principal place of business in the County, City and State of New York (hereinafter "City").

4.      Defendant David A. Hansel as Commissioner of Defendant City of New York Administration for Children's Services is responsible for all the functions, development and implementation of all policies of Defendant City of New York Administration For Children's Services.

5.      At all times herein mentioned, Defendant City of New York Administration for Children's Services is an administrative agency of Defendant City (hereinafter "ACS").

6.      Defendant Robert J. Mahon as Executive Director is responsible for all the functions, development and implementation of all policies of Defendant SCO Family of Services f/k/a St. Christopher Ottilie.

7.      At all times herein mentioned, Defendant SCO Family of Services f/k/a St. Christopher Ottilie is a Not-For-Profit corporation duly organized and existing pursuant to the laws of the State of New York with its principal place of business in the County of Nassau, State of New York and/or is doing business in the City of New York, State of New York (hereinafter "SCO"). At all times herein mentioned SCO is an agent and or contractor for defendants City and/or ACS.

8.      Defendant Seymour W. James, Jr. as Attorney-In Chief of Defendant Legal Aid Society is responsible for all the functions, development and implementation of all policies of Defendant Legal Aid Society.

9.      At all times herein mentioned, Defendant Legal Aid Society is a Not-For-Profit corporation duly organized and existing pursuant to the laws of the State of New York

2

with its principal place of business in the County, City and State of New York and/or is doing business in the County, City and State of New York (hereinafter "Legal Aid").  At all times herein mentioned Defendant Legal Aid engaged in advocating the enforcement of the Plaintiff's rights in all family court proceedings set forth below.

10. Defendant Samuel Antupit is espoused to Defendant Loretta Antupit and permanently residing in the Village of Farmington, County of Tunxis, State of Connecticut.  At all times herein mentioned Defendant Samuel Antupit is the maternal grandfather of the Plaintiff ("Mr. Antupit").

11. Defendant Loretta Antupit is espoused to Defendant Samuel Antupit and permanently residing in the Village of Farmington, County of Tunxis, State of Connecticut.  At all times herein mentioned Defendant Loretta Antupit is the maternal grandmother of the Plaintiff ("Mrs. Antupit").

12. Jurisdiction of the United States District Court is proper under 28 U.S.C. § 1331.  Venue in the Eastern District of New York is proper pursuant to 28 U.S.C. § 1391 *et seq.*  The Court retains supplemental jurisdiction over all pendant state claims pursuant to 28 U.S.C. § 1367(a).

**Statement of Fact**

**The Underlying Action**

13. The following facts were brought out at the Fact Finding Hearing in actions brought under Docket No.'s NA-16123-01 and NA-16124-01 in the Family Court, Queens County, New York.  That in or about November, 2001 the natural sibling of the Plaintiff, Peter (DOB: XX/XX/2001), suffered an injury to his person going unrealized to his mother, Stacey Rizzuto at the time and place of occurrence.

14. At all times prior to the occurrence the Plaintiff's parents had no history of child abuse or neglect, domestic violence or drug or alcohol abuse.

15. That morning, Stacey, a Certified Social Worker, brought Peter to the babysitter who resided within the same apartment building prior to engaging a patient in therapy within the home. The Plaintiff was brought to outside day care earlier that morning.

16. After the session with her patient Stacey retrieved Peter from the baby sitter who pointed out a lump on Peter's head the size of a penny.

17. With an abundance of caution, Stacey called the family pediatrician describing Peter's condition who advised her to keep watching the lump for any changes and to call back if it did not resolve itself.

18. The Plaintiff's father was not present in the apartment at the time of occurrence but had left earlier that morning to go to the gym and thereafter to work both in Long Island, New York.

19. Upon returning home that evening Stacey told Donald of the events of the day concerning Peter and the recommendations of the pediatrician.

20. Approximately three (3) days later the lump had grown markedly in size. Stacey called the pediatrician requesting an immediate appointment. The Plaintiff was brought to the home of the paternal grandparents and the parents continued thereafter with Peter to the pediatrician.

21. Both parents took Peter to the family pediatrician who after examining Peter instructed them to take Peter to the emergency room at Long Island Jewish Medical Center. The parents proceeded immediately thereto.

22. At the hospital Peter was examined by two (2) pediatric neurosurgeons and it was

4

determined he had suffered a Cephelohematoma, a condition best described as an accumulation of fluid between the skull and the scalp caused by trauma, to the right side of his head.

23. Neither pediatric neurosurgeon indicated that any injury Peter suffered was indicative of child abuse or neglect or that Peter needed any treatment for his injury. Peter received no treatment for his injury at any time.

24. The next day after admission to the hospital, Dr. Debra Ersenio-Jennsen, a pediatrician not certified in neurosurgery nor skull fracture based child abuse determinations interviewed the birth mother as to the event precipitating Peter's injury. Stacey delayed in responding having to recall which of the multiple falls Peter. She conveyed to Dr. Ersenio-Jennsen that Peter had taken numerous falls because he was learning to walk.

25. ACS was notified of Peter's injury by Dr. Ersenio-Jennsen and sent its caseworker to Long Island Jewish Hospital to investigate.

26. The caseworker thereafter went to the family home and engaged both parents as to what Stacey could remember that would have caused Peter's injury. Stacey recalled seeing Peter fall from the couch and thereafter recalled how the Plaintiff pushed Peter to the tile covered, concrete floor in the kitchen.

27. The father's claim he was never present at the time of the incident was investigated and cleared by Detectives of the New York City Police Department.

28. Later that day both birth parents demanded Peter's release to their custody which was denied by City and/or ACS.

29.     Peter was held at Long Island Jewish Hospital for observation under the guise of a "Social Hold" without a court order or the parents' consent to do so for approximately one (1) week, despite being medically cleared to leave the hospital on the second day.

## The Initial Intake Hearing

30.     Both parents were only then served one week after Peter's admission to the hospital with a Petition alleging the abuse of Peter at the hands of his parents while the Plaintiff was alleged to have been "Derivatively Neglected" in that the Plaintiff was in imminent danger of being abused or neglected.  At no time herein mentioned did the Petition contain allegations of medical neglect or any other allegations in any other form of child neglect against his parents.

31.     In or about November, 2001 it was the policy of Defendants City and/or ACS to remove children from the family home who were not the subjects of an abuse and/or neglect petition as suspected as being "Derivatively Neglected" regardless of any indicia of evidence as to same.

32.     A preliminary intake hearing was held in Queen County Family Court.  The parents claimed that the father was not present at the events underlying the City's and ACS's child abuse petition against them and that Peter's injuries were solely attributable to an accident.  Stacey and Donald requested the return of the Plaintiff and his brother which was denied.

33.     The father interposed an initial request to have the Plaintiff and his brother released to his individual custody based upon the premise that he was not present at the time of any impact and the police could place him away from the marital residence at the time and place of occurrences note above which was denied.

34.    Plaintiff and his brother Peter were assigned joint representation and law guardianship by defendant Legal Aid and remanded to the custody of Defendants City and ACS who by and through Defendant SCO retained custody of Peter and the Plaintiff. Both the Plaintiff and his brother were placed in the care of the paternal grandparents.

35.    Without cause or legal justification Plaintiff and his brother Peter were only allowed supervised visitation with Stacey and Donald between November, 2001 through and including May, 2010.

### The Fact Finding Hearing

36.    The Article 10 abuse case was assigned to the Hon. Barbara Salinitro, J.F.C, in Part 5 of Queens Family Court in or about early December, 2001. An ACS case worker was assigned at that time. Defendant Legal Aid was assigned to represent the Plaintiff and his brother. Actual fact finding hearings on the abuse petition were ordered to commence on or about January, 2002.

37.    Both birth parents were initially ordered to attend Parenting Skills training classes sponsored by SCO, attended faithfully and successfully completed this program in or about April, 2002. Attendance and completion of the Parenting Skills at the time was the sole requirement of the service plan implemented by ACS through SCO. Upon completion the birth parents demanded the return to home of the Plaintiff and Peter which was refused. Despite successful fulfillment of the service plan City and SCO advocated against returning the Plaintiff to the care of his parents.

38.    At all times herein mentioned it was the responsibility of Defendants City, ACS and SCO to formulate and implement a Service Plan with the goal of returning the Plaintiff to the custody of his parents and, in particular, the father which it did not.

7

39. Legal Aid did not join in the birth parents' aforementioned application to the court nor at any time thereafter advocate for the return of the children to the family home. There were no other orders or directives of the Court directed to the Plaintiff's parents at that time.

40. In or about November, 2003 the Hon. Barbara Salinitro, J.F.C adjudged no findings of abuse against the parents dismissing the abuse petition. The parents demanded the return of the Plaintiff and his brother. City and ACS, without cause, legal and/or factual justification claimed "parents were not ready to take the children home." The Plaintiff and his younger brother were ordered to remain in the custody and control of City and ACS with visitation supervised by ACS and SCO through the maternal foster grandparents, Mr. and Mrs. Antupit. This placement will be described in full hereafter.

41. In or about December, 2003 City appealed in the Supreme Court of the State of New York, Appellate Division, Second Department who reversed the findings of the lower court in or about July, 2004 (Exhibit "A").

42. At no time did the Appellate Division ever rule or articulate any findings as to what issues brought the Plaintiff's parents into the underlying action or any support to findings of abuse and/or neglect attributable directly to the Plaintiff's father who gave testimony at the Fact Finding Hearing to the effect that he was not present at any time during the events forming the basis of the Abuse Petition.

**The Permanency Proceeding**

43. In or about September, 2004, a permanency proceeding was convened with the goal enunciated by the Court and agreed upon by Legal Aid, SCO, ACS and the City for the eventual return of the Plaintiff and his brother to the custody of their parents.

44.    Defendants City, ACS and SCO thereafter brought an Article 10 Termination Petition
       seeking to disenfranchise permanently the Plaintiff and his brother from their parents.

45.    This simultaneous Article 10 Termination Proceeding was convened before Hon. Barbara
       Salinitro, J.F.C, in Part 5 of Queens Family Court in or about September, 2004. City,
       SCO, ACS and Legal Aid refused to join in the parent's application to return the Plaintiff
       and his brother to the family home until the birth parents could address, "the underlying
       issues that brought them into the system."

46.    At all times herein mentioned Defendants City, ACS nor SCO refused to explore any
       avenues to allow the Plaintiff to return to or remain in the care of his parents throughout
       these proceedings in contravention of the Social Services Law Sect. 409 and/or the
       Family Court Act.

47.    At all times herein mentioned Defendant Legal Aid failed to advocate throughout these
       proceedings for Defendants City, ACS nor SCO to effectuate a plan allowing the Plaintiff
       to return to the care of his parents as enunciated in the Social Services Law Sect. 409
       and/or the Family Court Act on behalf of the Plaintiff.

48.    Both parents were Court ordered into individual therapy in or about September, 2004 and
       engaged in said therapy between 2004 and 2006 under the auspices of several therapists.

49.    At no time did Defendants City, ACS nor SCO ever contact each therapist informing
       them of issues that needed to be addressed in therapy with the parents to ameliorate
       whatever conditions were responsible for bringing the Plaintiff and his brother into foster
       care.

50.    Each therapist opined that each parent posed of no danger to the Plaintiff or his brother
       and that each if not both parents was/were fully capable of caring for the Plaintiff and his

brother.

51.    Throughout that time, the articulated goal of the Queens Family Court in the dispositional proceedings was to return the Plaintiff and his brother Peter to the custody of their parents.

52.    Between in or about August, 2002 and in or about March, 2006 the Plaintiff was reported by Defendant SCO's assigned case worker as well cared for, thriving and forging the necessary parental bonds to ensure he and his brother would be returned to the family home.

## The Connecticut Placement

53.    In 2002 the paternal grandparents felt they could no longer care for the Plaintiff and his brother Peter.

54.    In or about August, 2002 with the hearing on the abuse petition still ongoing, the Plaintiff and his brother were moved into the foster care of Stacey's parents, the Antupits in Farmington, Connecticut by and through Defendant SCO. The parents resided in the family home in Queens, New York at the time of the transfer. The Antupits were tasked with supervising the visitation between the children and their parents.

55.    At no time herein mentioned did Defendant City, ACS or SCO reimburse Mr. and Mrs. Rizzuto for travel expenses, though mandated to do so, and had to be sued by the Rizzutos in Civil Court, New York County for reimbursement.

56.    Mr. And Mrs. Antupit never accepted Stacey's marriage to Donald Rizzuto. Early on in the marriage Mrs. Antupit told Stacey she should divorce Donald and abort Matthew when he was an unborn fetus. Donald Rizzuto's recent failing business venture only heated their animosity toward him.

10

57.     Carol Hochburg, the assigned Legal Aid attorney representing the Plaintiff and his
        brother in the Family Court proceedings told the Antupits that if the parental rights of
        Donald and Stacey Rizzuto were terminated, the Plaintiff and Peter could be freed for
        adoption in favor of the Mr. and Mrs. Antupit. Under this nefarious scheme, Stacey
        would be forced to chose between her children or her husband, both of whom she loved
        as she could effectively only have a relationship with one or the other. Stacey would
        have to divorce Donald so as to maintain a relationship with the Plaintiff and Peter.

58.     In or about September, 2005 Donald Rizzuto had a heated verbal exchange with Mr.
        Antupit. Mr. and Mrs. Antupit brought a petition to the Family Court for an Order of
        Protection against Donald Rizzuto.

59.     Knowing that a hearing on the matter would add additional significant delay to the
        Family Court proceedings and upon an application to the Court by the City, SCO and
        Legal Aid in September, 2005 a consent temporary order of protection was issued by
        Hon. Barbara Salinitro, J.F.C, in Part 5 of Queens Family Court in favor of Mr. and Mrs.
        Antupit effectively denying the Plaintiff's father visitation of any kind other than
        telephone contact supervised by Mr. and Mrs. Antupit. The father was allowed physical
        visitation through a neighbor of the Antupits who supervised these visitations with the
        permission of the Court.

60.     At all times herein mentioned, Legal Aid, SCO through its case workers, City and ACS
        knew Stacey went to reside locally in Connecticut and took over a majority of the care of
        the Plaintiff and his brother at times unsupervised since on or about August, 2002.

61.     At no time herein mentioned was it ever asserted or proven the Plaintiff to be in any
        danger by the care afforded by Stacey.

62.  In or about March, 2006 Legal Aid in concert with Mr. and Mrs. Antupit and with the acquiescence and  assistance of City, ACS and SCO, sought an order from the Court to deny the Plaintiff's mother any form of contact with the Plaintiff claiming that Stacey was residing at the Antupit's home in violation of court orders.  This came through the advocacy of Legal Aid, ACS and City which was opposed by the parents.

63.  Stacey was ordered not to have any physical visitation with the Plaintiff and his brother that would have to be supervised by Samuel and Loretta Antupit.  As with the father, Stacey's visitation was ordered to be supervised by the neighbor supervising the father's physical visitation.

64.  In April, 2006 whilst on a visit with the children, the supervising neighbor was called away momentarily while the Plaintiff and his brother were dining on Easter dinner only to return at the end of the meal.

65.  Legal Aid with the material assistance of Samuel and Loretta Antupit initiated proceedings to end the physical visitation based upon the momentary lapse of the neighbor's supervision which was granted.

66.  Upon an application to the Court by legal Aid with the acquiescence of  City, SCO and SCO an order was issued by Hon. Barbara Salinitro, J.F.C, in Part 5 of Queens Family Court denying the Plaintiff's mother and father visitation of any kind other than telephone contact supervised by Mr. and Mrs. Antupit.

67.  Stacey and Donald took up residence together in Long Island, New York in anticipation of the return of the Plaintiff and his brother to the family home as per the SCO case worker who assured them of same.

68.   At one point Legal Aid in concert with Mr. and Mrs. Antupit complained to the Court
      that the Plaintiff's parents were calling too much and further alleging the parents were
      abusive to the Antupits during the calls.  Upon the application of Legal Aid with the
      material assistance of Mr. and Mrs. Antupit, the Family Court cut off all communication
      and contact between the Plaintiff and his brother with their parents.

69.   This "No-Contact Order" continued for nearly two years until January, 2008, the sole
      purpose of which was to bolster the goals of City, ACS, SCO, Legal Aid and Mr. and
      Mrs. Antupit to put the Plaintiff up for adoption in favor of the Antupits and not for the
      protection of the best interest of the Plaintiff and his brother in contradiction of the
      articulated goal of the Queens Family Court.

70.   At no time was the Plaintiff ever removed from the Connecticut Foster Home for the
      maternal foster grandparents failing to follow court orders.  City, ACS and SCO
      purported such a removal of the Plaintiff and his brother to a setting which could enable
      Stacey and Donald any form of visitation could not be achieved due to a claimed
      "Inconvenience."  Legal Aid colluded with City, ACS, SCO and the Antupits to have
      them adopt the Plaintiff and his brother.

71.   At no time did Defendants City, ACS or SCO modify any service plan to ameliorate the
      total loss of contact between the Plaintiff and his brother and their parents.

### The Termination Proceeding

72.   In or about September, 2004 Hon. Barbara Salinitro, J.F.C, in Part 5 of Queens Family
      Court convened Termination Proceedings against the birth parents brought through a
      petition interposed by Defendants City through ACS in direct contravention of the
      directive of Appellate Division, Second Department.  Mr. and Mrs. Antupit retained an

13

attorney who became involved in the Termination Proceeding who advocated freeing the Plaintiff and his brother up for adoption.

73. Said proceedings were consistently adjourned at the bequest of City and ACS based upon the non-appearance of its counsel.  At no time did Legal Aid object to any delays in proceedings nor did City or ACS assign replacement counsel.

74. At all times herein mentioned the Respondent birth parents faithfully attended each and every scheduled court appearance of the dispositional and termination hearings. At each appearance all prior Orders of the Court were continued.  The parents successfully made an application to continue the Dispositional Hearing which had been suspended in favor of the Termination Hearing.  As a result of purposeful delay by City and ACS with the acquiescence of Legal Aid and despite objections by the parents, the termination proceeding concluded in or about September, 2008 ending in its dismissal in favor of the Plaintiff's parents.

75. In or about November, 2008 the Hon. Barbara Salinitro, J.F.C, in Part 5 of Queens Family Court re-convened the dispositional hearing to address ongoing objections of City, ACS, SCO and Legal Aid to the return of the Plaintiff to the custody of the parents.

76. Despite an ongoing pattern of non-appearance by counsel for the Petitioners City and ACS, in or about July, 2010 the dispositional hearing was concluded culminating in a final report of Referee Mulrooney to Hon. Barbara Salinitro, J.F.C recommending the return of the Plaintiff and his brother to the custody of his birth parents.  Hon. Barbara Salinitro, J.F.C issued an Order as to same in or about July, 2010 and the children were subsequently returned to their parents in or about August, 2010.

14

## AS AND FOR A FIRST CAUSE OF ACTION
## AGAINST DEFENDANTS CITY, ACS AND SCO
### (42 U.S.C. § 1983)

Plaintiff alleges each and every allegation "1" through "76" set forth above and further alleges as follows:

77. The City of New York Administration for Children's Services ("ACS"), a department of Defendant City of New York ("City") failed to provide services to reunite children in its custody with their biological family members by violating statutes that require ACS officials to follow guidelines and to take affirmative action to ensure well being and promote welfare of children in violation of 42 U.S.C. 1983.

78. That the Defendant SCO, City and Defendant ACS, by and through Defendant City, receives funds from the United States of America to provide services to reunite children in its custody with their biological family members to take affirmative action to ensure the well being and promote welfare of children in violation of 42 U.S.C.A. 1983.

79. That a private right of action exists to enforce federal funding statutes That defendant City appropriated by or through the Federal Government and/or the State of New York for adoption and in otherwise getting children out of foster care.

80. The City of New York Administration for Children's Services ("ACS"), a department of Defendant City of New York by and through its authorized agent SCO failed to provide services to reunite children in its custody with their biological family members by violating statutes that require ACS officials to follow guidelines and to take affirmative action to ensure well being and promote welfare of children in violation of 42 U.S.C. 1983.

81.   That the Plaintiff was deprived of his right to family integrity derived both from the First
      Amendment's broad right of association and Fourteenth Amendment's general
      substantive due process protections.

82.   That defendants City by and through ACS and SCO failed to provide the least restrictive,
      most family-like placement to meet the Plaintiff's individual needs.

83.   That defendants City by and through ACS and SCO  failed to provide adequate services
      to ensure the Plaintiff did not deteriorate by and through its duly authorized agents,
      servants, fiduciaries and/or employees, *to wit*, ACS failed to investigate whether the
      Plaintiff was in danger in the time and manner required by law.

84.   That defendants City by and through ACS and SCO failed to provide mandated pre-
      placement service to enable the Plaintiff to remain and/or return home.

85.   That defendants City by and through ACS and SCO  failed to provide appropriate case
      management or plans that enabled the Plaintiff to be returned home and particularly the
      birth father or be discharged to permanent placements as quickly as possible.

86.   That defendants City by and through ACS and SCO  failed to provide services to assist
      the Plaintiff physically, psychologically or emotionally while in foster care.

87.   That defendants City by and through ACS and SCO failed to provide adequate and timely
      administrative, judicial or dispositional reviews to which the Plaintiff was entitled.

88.   That defendants City by and through ACS and SCO failed to provide caseworkers with
      adequate training, support and supervision.

89.   That defendants City, ACS and SCO filed a Termination Petition in contravention of a
      directive of the Appellate Division, Second Department and/or the Family Court to

continue the dispositional proceedings with the sole intention of causing an unwarranted delay in the return of the Plaintiff to the birth parents and particularly the birth father.

90.     That defendants City by and through ACS and SCO failed to maintain adequate systems to monitor, track and plan for the Plaintiff.

91.     That defendants City, ACS and SCO willfully disregarded the fact that the birth father was not present at the events and circumstances forming the basis of the underlying Article 10 proceeding and at all times herein mentioned was ready, willing and able to take care for the Plaintiff.

92.     That the actions of defendants City by and through ACS and SCO directly and proximately caused or were a substantial factor in bringing about Plaintiff being deprived of his right to family integrity derived both from the First Amendment's broad right of association and Fourteenth Amendment's general substantive due process protections.

93.     That damages of $9,000,000 are presumed pursuant to 42 U.S.C. 1983.

### AS AND FOR A SECOND CAUSE OF ACTION
### AGAINST DEFENDANTS CITY AND ACS
### (Deprivation of rights under the First and Fourth Amendments)

Plaintiff alleges each and every allegation "1" through "93" set forth above and further alleges as follows:

94.     In or about November, 2001 it was the policy of Defendants City and/or ACS to remove children from the family home who were not the subjects of abuse and/or neglect petitions regardless of the lack of evidence of same as "Derivatively Neglected."

95.     The Plaintiff's removal by Defendant City and/or ACS from the family home despite no allegations of abuse or neglect as to his person by his birth parents and particularly the

birth father constitutes an illegal seizure of his person under the Fourth Amendment of the Constitution of the United States of America.

96.  That there existed no exigent circumstances to justify the seizure of the Plaintiff by defendants City and/or ACS extricating him from his family home and particularly the birth father for approximately nine (9) years.

97.  For approximately nine (9) years Defendants City and /or ACS detained the Plaintiff from his biological family home and particularly the birth father without cause or legal justification by or through Defendant SCO.

98.  That the actions of Defendants City by and through ACS and SCO directly and proximately caused or were a substantial factor in bringing about Plaintiff being deprived of his right to family integrity derived both from the First Amendment's broad right of association and Fourth Amendment's general substantive due process protections.

99.  That the Plaintiff suffered damages of not less than $9,000,000 for the deprivation of his constitutional rights under the 14th Amendment of the Constitution of the United States of America.

## AS AND FOR A THIRD CAUSE OF ACTION
## AGAINST DEFENDANT SCO
**(Aiding and abetting deprivation of rights under the First and Fourth Amendments)**

Plaintiff alleges each and every allegation "1" through "99" set forth above and further alleges as follows:

100.  In or about November, 2001 it was the policy of Defendants City and/or ACS to remove children from the family home who were not the subjects of abuse and/or neglect petitions regardless of the lack of evidence of same as "Derivatively Neglected."

101.   The Plaintiff's removal by defendant City and/or ACS from the family home despite no allegations of abuse or neglect as to his person by his birth parents, in particular the birth father, constitutes an illegal seizure of his person under the Fourth Amendment of the Constitution of the United States of America.

102.   Defendant SCO was contracted by Defendants City and/or ACS to place the Plaintiff in foster care and to implement strategies and programs that foster the return of the Plaintiff to the biological family and/or the birth father.

103.   At all times herein mentioned Defendant SCO failed to implement strategies and programs that foster the return of the Plaintiff to the biological family and/or the birth father.

104.   At all times herein mentioned case workers for Defendant SCO knew and reported to SCO that the biological parents and in particular the birth father was/were ready, willing and able to provide a safe and nurturing home for the Plaintiff which was willfully ignored by Defendant SCO.

105.   For approximately nine (9) years Defendants City and /or ACS detained the Plaintiff from his biological family home and particularly the birth father without cause or legal justification by or through Defendant SCO.

106.   That the actions of defendants City by and through ACS and SCO directly and proximately caused or were a substantial factor in bringing about Plaintiff being was deprived of his right to family integrity derived both from the First Amendment's broad right of association and Fourteenth Amendment's general substantive due process protections.

107.   Defendant SCO provided material assistance to Defendants City and/or ACS in the deprivation of the Plaintiff's rights under the 14th Amendment of the Constitution of the United States of America.

108.   That the Plaintiff suffered damages of not less than $9,000,000 for the deprivation of his constitutional rights under the 4th Amendment of the Constitution of the United States of America.

### AS AND FOR A FOURTH CAUSE OF ACTION
### AGAINST DEFENDANTS CITY AND ACS
### (Denial of Substantive Due Process Rights)

Plaintiff alleges each and every allegation "1" through "108" set forth above and further alleges as follows:

109.   That Defendants City and ACS simultaneously acquiescing to the goal of the Family Court in the Permanency Hearing to return the Plaintiff to the custody and care of the birth parents and particularly the birth father while filing an Article 10 Termination Petition seeking to free the Plaintiff for adoption is so shocking, arbitrary, contra intuitive, contradictory and egregious that the Due Process Clause would not continence such action even where it accompanied by full procedural protection.

110.   That the sole purpose of such actions was to create an inordinate delay in returning the Plaintiff to the family home and particularly the birth father or was calculated to do so.

111.   That the actions of Defendants City and ACS did create an inordinate delay in returning the Plaintiff to the family home or placing him for adoption.

112.   That the Plaintiff suffered presumed damages of not less than $9,000,000 for the deprivation of his Substantive Due Process Rights under the 4th Amendment of the Constitution of the United States of America.

20

### AS AND FOR A FIFTH CAUSE OF ACTION
### <u>AGAINST DEFENDANTS CITY ACS AND LEGAL AID</u>
### (Violation of 42 U.S.C. § 1985)

Plaintiff alleges each and every allegation "1" through "112" set forth above and further alleges as follows:

113.   Defendant Legal Aid conspired with Co-Defendants City, ACS and Mr. and Mrs. Antupit to deprive the Plaintiff of his First Amendment Right to Family Integrity by joining in Defendants City and ACS simultaneously acquiescing to the goal of the Family Court in the Permanency Hearing to return the Plaintiff to the custody and care of the birth parents while filing an Article 10 Termination Petition seeking to free the Plaintiff for adoption.

114.   That Defendant Legal Aid joined in the application brought by Defendants City and ACS to simultaneously convene a Termination Proceeding and a Permanency Proceeding with contradictory goals.

115.   As a result of the actions of Legal Aid the Plaintiff was deprived of his rights under the 1st 4th and/or 14th Amendment(s) to the United States Constitution.

116.   As a result of the actions/inactions of Defendants City, ACS and/or Legal Aid, the Plaintiff suffered damages of not less than $9,000,000.

### AS AND FOR A SIXTH CAUSE OF ACTION
### <u>AGAINST DEFENDANTS ACS and SCO</u>
### (Social Work Malpractice)

Plaintiff alleges each and every allegation "1" through "116" set forth above and further alleges as follows:

117.   Defendants ACS and/or SCO  had an affirmative duty to provide supportive and rehabilitative services to the Plaintiff and the birth parents to stabilize and preserve

family life for the purpose of averting an impairment or disruption of the family which will or could result in the placement of the Plaintiff in foster care; enabling the Plaintiff once placed in foster care to return to his family at an earlier time than would otherwise be possible; or, reducing the likelihood the Plaintiff when discharged from foster care would return to such care.

118.    Defendants ACS and/or SCO failed to derive a Service Plan incorporating supportive and rehabilitative services to the Plaintiff and the birth parents to stabilize and preserve family life for the purpose of averting an impairment or disruption of the family which will or could result in the placement of the Plaintiff in foster care; enabling the Plaintiff once placed in foster care to return to his family at an earlier time than would otherwise be possible; or, reducing the likelihood the Plaintiff when discharged from foster care would return to such care.

119.    Defendants ACS and/or SCO failed to adequately supervise and train its Child Welfare Personnel to derive and implement a Service Plan incorporating supportive and rehabilitative services to the Plaintiff and the birth parents to stabilize and preserve family life for the purpose of averting an impairment or disruption of the family which will or could result in the placement of the Plaintiff in foster care; enabling the Plaintiff once placed in foster care to return to his family at an earlier time than would otherwise be possible; or, reducing the likelihood the Plaintiff when discharged from foster care would return to such care.

120.    That Defendants ACS and/or SCO received adequate State and/or Federal funding to prevent child abuse and maltreatment of the Plaintiff and enhance positive parent child interactions, increase healthy outcomes for families to develop and achieve their self-

22

sufficiency goals including encouraging and facilitating visitation with the Plaintiff by the non-custodial birth parents.

121.    Defendants ACS and/or SCO failed in its aforementioned duties by not relocating the Plaintiff out of foster care in Connecticut in favor of placement in a more convenient location to facilitate sufficient contact with the birth parents and particularly the birth father who resided in Queens, New York for over five (5) years.

122.    That Defendants ACS and/or SCO willfully failed to incorporate in its Service Plan any reimbursement for travel expenses for the Birth Parents causing them severe financial burdens significantly impairing the Birth Parents ability to comply with the Service Plan.

123.    That as a result of the of Defendants ACS's and/or SCO's failure to derive a reasonable Service Plan and to implement same the Plaintiff suffered deprivation of parental contact, and, in particular, the birth father for such an extended time particularly given the enunciated goal of the Family Court to return the Plaintiff to the custody of the birth parents, causing the Plaintiff to suffer family disruption and otherwise depriving the Plaintiff of positive parent child interactions resulting in the Plaintiff suffering severe emotional problems to this day and in the future.

124.    As a result of the above mentioned premises, the Plaintiff suffered and continues to suffer depression, suicidal thoughts and extreme emotional distress damages translating in an amount totaling not less than $9,000,000.

## AS AND FOR A SEVENTH CAUSE OF ACTION
## AGAINST DEFENDANT LEGAL AID
### (Legal Malpractice)

Plaintiff alleges each and every allegation "1" through "124" set forth above and further alleges as follows:

23

125.  At all times herein mentioned Defendant Legal Aid represented the legal interests of the
      Plaintiff in Dockets N-16123/01 and N-16124/01 in the Family Court, Queens County.

126.  The Family Court's goal of the Permanency was to return the Plaintiff to the custody and
      care of his parents.

127.  Defendant Legal Aid failed to advocate for a Trial Discharge of the Plaintiff to the birth
      parents during the pendency of the Permanency Hearing based on the enunciated goals at
      the Permanency Hearing.

128.  Defendant Legal Aid failed to interpose a motion before the Family Court requesting no
      further review of the Permanency and advocating the return of the Plaintiff to the care of
      his birth parents.

129.  That Defendant Legal Aid failed to interpose opposition to the application of Defendants
      City and ACS to convene an Article 10 Termination Petition knowing the goal of the
      Family Court at the Permanency Hearing was the return of Plaintiff to his birth parents.

130.  Defendant Legal Aid actively aided and supported positions on behalf of the Plaintiff
      advocated by Defendants City and ACS which it knew or had reason to know were not in
      the best interest of the Plaintiff including, but not limited to, soliciting, cajoling
      advocating and/or encouraging the adoption of the Plaintiff by the foster maternal
      grandparents in direct contravention of the goals of the Family Court enunciated at the
      Permanency Hearing.

131.  That Defendant Legal Aid failed to train and/or supervise its agents, servants and/or
      employees in effectuating its duties to the Plaintiff.

132.  The actions and/or inactions of Defendant Legal Aid were a substantial factor in the
      Plaintiff's deprivation of his Substantive Due Process and any and all other rights

24

afforded him under the Constitution of the State of New York and/or the Constitution of the United States of America.

133.   The actions/inactions of Defendant Legal Aid were deviant of the standard of care Defendant Legal Aid owed the Plaintiff and/or in direct contravention of what the Family Court deemed to be in the best interest of the Plaintiff.

134.   The Plaintiff suffered and continues to suffer damages totaling not less than $9,000,000 as a direct result of the negligence of Defendant Legal Aid.

## AS AND FOR A EIGHTH CAUSE OF ACTION
## AGAINST DEFENDANT CITY AND ACS
### (False Arrest and Imprisonment)

Plaintiff alleges each and every allegation "1" through "134" set forth above and further alleges as follows:

135.   Defendants ACS and SCO intended to confine and did so confine the Plaintiff in foster care despite the enunciated goal of the Family Court at the Permanency was to return the Plaintiff to the care of his birth parents.

136.   At all times herein mentioned the birth parents were ready, willing and able to care for the Plaintiff outside of foster care.

137.   At all times herein mentioned the Plaintiff was aware that he was being deprived of the care of his birth parents and particularly his birth father and conveyed his desire to return to same to Defendants City and ACS.

138.   At all times herein mentioned such confinement of the Plaintiff in foster care was not privileged given the Defendants' knowledge of the goal of the Permanency was to return the Plaintiff to the care of his birth parents and that the birth parents and particularly the birth father were ready, willing and able to care for the Plaintiff outside of foster care.

139.   As a result of the actions of Defendants City and ACS the Plaintiff suffered and continues
to suffer to this day humiliation and mental and emotional anguish quantifiable in money
damages in an amount not less than $9,000,000.

## AS AND FOR A NINTH CAUSE OF ACTION
## AGAINST DEFENDANT CITY AND ACS
### (Intentional Infliction of Emotional Distress)

Plaintiff alleges each and every allegation "1" through "139" set forth above and further
alleges as follows:

140.   Defendants City and ACS sought a "No Contact" order against both birth parents based
upon certain allegations by the Connecticut foster grandparents against the birth father
and/or allegations the birth mother assisted the Connecticut foster grandparents in the
care of the Plaintiff under their supervision, a fact known to defendant SCO.

141.   Defendants City and ACS knew that the plaintiff could have enjoyed supervised
visitation with both/either birth parents if the Plaintiff was relocated to outside the care of
the Connecticut foster grandparents.

142.   Defendants City and ACS knew the goal of the Permanency was to return the Plaintiff to
the custody and care of his birth parents as being in the Plaintiff's best interest.

143.   Defendants City and ACS refused to entertain moving the Plaintiff to another foster care
placement which would ameliorate all barriers to the Plaintiff having supervised
visitation with the birth parents as "inconvenient" and "expensive".

144.   As a result of the aforementioned premises, the Plaintiff did not have any direct contact in
any form with his birth parents for over approximately twenty-two (22) months though it
was his desire to do so.

145.    Such lack of contact at the instigation and efforts of Defendants City and ACS comprises
        a willful disregard of a substantial probability of causing the Plaintiff sever emotional
        distress requiring the Plaintiff to undergo extensive psychotherapy to endure the situation
        of not having any contact whatsoever with his birth parents.

146.    The Plaintiff has suffered and to date continues to suffer severe emotional trauma,
        depression, social maladjustment, emotional pain and/or thoughts of suicide as a direct
        result of this deprivation of all contact with his birth parents during his fragile formative
        years.

147.    The Plaintiff's anguish can be viewed as quantifiable in money damages jointly and
        severally against Defendant City and ACS in an amount not less than $9,000,000.

### AS AND FOR A TENTH CAUSE OF ACTION
### <u>AGAINST DEFENDANT CITY AND ACS</u>
### (Common Law Tort)

        Plaintiff alleges each and every allegation "1" through "147" set forth above and further
        alleges as follows:

148.    The sole purpose of Defendants City and ACS in bringing an Article 10 Termination
        Proceeding was to contravene the enunciated goal of the Family Court in the Permanency
        Proceeding and cause undue delay in effectuating the enunciated goals of the Family
        Court to return the Plaintiff to the custody of his birth parents without cause or legal
        justification.

149.    That Defendants City and ACS refused to effectuate a plan whereby the birth parents and
        in particular the birth father could maintain physical, in person visitation with the
        Plaintiff, supervised or otherwise, in pursuing the "No Contact" and otherwise refused

without cause or legal justification to effectuate any accommodation in the Service Plan to allow for same.

150.   That Defendants City and/or ACS insistence that the birth parents address, "issues that brought them into the system" and that placement of the Plaintiff in foster care until such time when no such issues were ever articulated by the Family Court nor the Appellate Division was calculated to make such condition for the Plaintiff's return to the custody of the birth parents otherwise effectively unobtainable.

151.   Such lack of contact at the instigation and efforts of Defendants City and ACS comprises a willful disregard of a substantial probability of causing the Plaintiff severe emotional distress requiring the Plaintiff to undergo extensive psychotherapy to endure the situation of not having any contact whatsoever with his birth parents.

152.   As a result of the actions of Defendants City and ACS the Plaintiff suffered and continues to suffer to this day humiliation and mental and emotional anguish quantifiable in money damages in an amount not less than $9,000,000.

### AS AND FOR A ELEVENTH CAUSE OF ACTION
### AGAINST DEFENDANT CITY AND ACS
**(Gross Negligence)**

Plaintiff alleges each and every allegation "1" through "152" set forth above and further alleges as follows:

153.   That Defendants City and ACS refused to effectuate a plan whereby the birth parents and in particular the birth father could maintain physical, in person visitation with the Plaintiff, supervised or otherwise, in pursuing the "No Contact" and otherwise refused without cause or legal justification to effectuate any accommodation in the Service Plan to allow for same.

154.    That Defendants City and/or ACS insistence that the birth parents address, "issues that brought them into the system" and that placement of the Plaintiff in foster care until such time when no such issues were ever articulated by the Family Court nor the Appellate Division was calculated to make such condition for the Plaintiff's return to the custody of the birth parents otherwise effectively unobtainable.

155.    Such lack of contact at the instigation and efforts of Defendants City and ACS caused by the Defendants' contrived pattern of willful delay comprises a willful disregard of Plaintiff's Substantive Due Process rights.

156.    As a result of the actions of Defendants City and ACS the Plaintiff suffered and continues to suffer to this day humiliation and mental and emotional anguish quantifiable in money damages in an amount not less than $9,000,000.

## AS AND FOR A TWELFTH CAUSE OF ACTION
## AGAINST DEFENDANT LEGAL AID
### (Common Law Tort)

Plaintiff alleges each and every allegation "1" through "156" set forth above and further alleges as follows:

157.    Defendant Legal Aid had a duty to advocate safeguard the civil rights of the Plaintiff in its representation of the Plaintiff in the Family Court proceedings as set forth above.

158.    Defendant Legal Aid had a duty to safeguard the substantive due process rights of the Plaintiff in its representation of the Plaintiff in the Family Court proceedings as set forth above in a reasonable manner.

159.    Defendant Legal Aid had a duty to safeguard the procedural due process rights of the Plaintiff in its representation of the Plaintiff in the Family Court proceedings as set forth above in a reasonable manner.

160.   Defendant Legal Aid had a duty to the Plaintiff to ensure a proper service plan was in place to reunite the Plaintiff with his family in a reasonable manner.

161.   Defendant Legal Aid had a duty to the Plaintiff to properly train, supervise, manage and control the actions of its employees in the course of their representation of the Plaintiff in the Family Court proceedings as set forth above in a reasonable manner.

162.   That at all times herein mentioned the enunciated goal of the Family Court throughout the dispositional hearing was to reunite the Plaintiff with his mother and father as being in the Plaintiff's best interests.

163.   In contravention of the enunciated goals of the Family Court and otherwise the Plaintiff's best interests, Defendant Legal Aid by and through its employees engaged in a pattern of willful delay, spurious court filings and other acts otherwise intended to disenfranchise the Plaintiff from his mother and father in favor giving custody of the Plaintiff to Defendants Samuel Antupit and Loretta Antupit.

164.   Lack of contact between the Plaintiff and his parents at the instigation and efforts of Defendant Legal Aid caused by the Defendant's contrived pattern of willful delay through spurious court filings and acts comprises a willful disregard of Plaintiff's Substantive Due Process rights.

165.   That Legal Aid by and through its employees took actions against the Plaintiff's best interests as noted above with the intent to disenfranchise the Plaintiff from his mother and father.

166.   Legal Aid knew or should have known that the aforementioned actions would cause and did cause the Plaintiff severe emotional distress.

165. As a result of the actions of Defendant Legal Aid the Plaintiff suffered and continues to suffer to this day humiliation and mental and emotional anguish quantifiable in money damages in an amount not less than $9,000,000.

## AS AND FOR A THIRTEENTH CAUSE OF ACTION
## AGAINST DEFENDANTS SAMUEL AND LORETTA ANTUPIT
### (Common Law Tort)

Plaintiff alleges each and every allegation "1" through "165" set forth above and further alleges as follows:

166. Defendants Samuel Antupit and Loretta Antupit had an obligation not to interfere with or facilitate the violation of the civil rights of the Plaintiff in Legal Aid's representation of the Plaintiff in the Family Court proceedings as set forth above.

167. Defendants Samuel Antupit and Loretta Antupit had an obligation not to interfere with or facilitate the violation of the substantive due process rights of the Plaintiff in Legal Aid's representation of the Plaintiff in the Family Court proceedings as set forth above in a reasonable manner.

168. Defendants Samuel Antupit and Loretta Antupit had an obligation not to interfere with or facilitate the violation of the procedural due process rights of the Plaintiff in Legal Aid's representation of the Plaintiff in the Family Court proceedings as set forth above in a reasonable manner.

169. Defendants Samuel Antupit and Loretta Antupit had an obligation not to interfere with or facilitate the usurpation of a proper service plan meant to reunite the Plaintiff with his family in a reasonable manner.

170. That Defendants Samuel antupit and Loretta Antupit knew or had reason to know at all times herein mentioned the enunciated goal of the Family Court throughout the

dispositional hearing was to reunite the Plaintiff with his mother and father as being in the Plaintiff's best interests.

171.    In contravention of the enunciated goals of the Family Court and otherwise the Plaintiff's best interests, Defendants Samuel Antupit and Loretta Antupit enticed, cajoled and provided material assistance to Defendant Legal Aid by and through its employees to engage in a pattern of willful delay, spurious court filings and other acts otherwise intended to disenfranchise the Plaintiff from his mother and father in favor giving custody of the Plaintiff to Defendants Samuel Antupit and Loretta Antupit.

172.    Lack of contact between the Plaintiff and his parents at the instigation and efforts of Defendants Samuel Antupit and Loretta Antupit caused by the Defendant's contrived pattern of assisting in acts causing willful delay through spurious court filings and acts comprises a willful disregard of Plaintiff's Substantive Due Process rights.

173.    Samuel Antupit and Loretta Antupit took actions against the Plaintiff's best interests as noted above with the intent to disenfranchise the Plaintiff from his mother and father without cause or legal justification.

174.    Samuel Antupit and Loretta Antupit knew or should have known that the aforementioned actions would cause and did cause the Plaintiff severe emotional distress.

175.    As a result of the actions of Defendants Samuel Antupit and Loretta Antupit the Plaintiff suffered and continues to suffer to this day humiliation and mental and emotional anguish quantifiable in money damages in an amount not less than $9,000,000.

### AS AND FOR A FOURTEENTH CAUSE OF ACTION AGAINST DEFENDANTS SAMUEL ANTUPIT, LORETTA ANTUPIT, CITY, ACS, SCO AND LEGAL AID
(Conspiracy)

Plaintiff alleges each and every allegation "1" through "175" set forth above and further alleges as follows:

176.   Defendants City, ACS, SCO, Legal Aid, Samuel Antupit and Loretta Antupit acted individually and in concert, tacitly or directly, to deprive the Plaintiff of his civil rights and his right to substantive due process.

177.   The aforementioned acts enunciated in the Complaint by Defendants City, ACS, SCO, Legal Aid, Samuel Antupit and Loretta Antupit were reasonably calculated to deprive the Plaintiff of his civil rights and substantive due process rights.

178.   The Plaintiff was deprived of his civil rights and substantive due process rights by the collective actions of Defendants City, ACS, SCO, Legal Aid, Samuel Antupit and Loretta Antupit.

179.   The loss of the Plaintiff's civil rights and right to substantive due process caused the Plaintiff to have suffered and continue to suffer to this day humiliation and mental and emotional anguish quantifiable in money damages in an amount not less than $9,000,000.

**WHEREFORE**, the Plaintiff respectfully requests the Court award damages in an amount of not less than $9,000,000 jointly and severally against Defendants City, ACS and SCO in Plaintiff's First Cause of Action; the Plaintiff respectfully requests the Court award damages in an amount of not less than $9,000,000 jointly and severally against Defendants City and ACS in Plaintiff's Second Cause of Action; the Plaintiff respectfully requests the Court award damages in an amount of not less than $9,000,000 against Defendants SCO in Plaintiff's Third Cause of Action; ; the Plaintiff respectfully requests the Court award damages in an amount of not less than $9,000,000 against Defendants SCO in Plaintiff's Third Cause of Action; the Plaintiff respectfully requests the Court

award damages in an amount of not less than $9,000,000 jointly and severally against Defendants City and ACS in Plaintiff's Fourth Cause of Action; the Plaintiff respectfully requests the Court award damages in an amount of not less than $9,000,000 jointly and severally against Defendants City, ACS and Legal Aid in Plaintiff's Fifth Cause of Action; the Plaintiff respectfully requests the Court award damages in an amount of not less than $9,000,000 jointly and severally against Defendants ACS and/or SCO in Plaintiff's Sixth Cause of Action; the Plaintiff respectfully requests the Court award damages in an amount of not less than $9,000,000 against Defendant Legal Aid in Plaintiff's Seventh Cause of Action; the Plaintiff respectfully requests the Court award damages in an amount of not less than $9,000,000 jointly and severally against Defendants City and ACS in Plaintiff's Eighth Cause of Action; the Plaintiff respectfully requests the Court award damages in an amount of not less than $9,000,000 jointly and severally against Defendants City and ACS in Plaintiff's Ninth Cause of Action; the Plaintiff respectfully requests the Court award damages in an amount of not less than $9,000,000 jointly and severally against Defendants City and ACS in Plaintiff's Tenth Cause of Action; the Plaintiff respectfully requests the Court award damages in an amount of not less than $9,000,000 jointly and severally against Defendants City and ACS in Plaintiff's Eleventh Cause of Action;  the Plaintiff respectfully requests the Court award damages in an amount of not less than $9,000,000 against Defendant Legal Aid in Plaintiff's Twelfth Cause of Action; the Plaintiff respectfully requests the Court award damages in an amount of not less than $9,000,000 against Defendants Samuel Antupit and Loretta Antupit, jointly and severally in Plaintiff's Thirteenth Cause of Action; and, the Plaintiff respectfully requests the Court award damages in an amount of not less than

$9,000,000 against Defendants City, ACS, SCO, Legal Aid, Samuel Antupit and Loretta Antupit in Plaintiff's Fourteenth Cause of Action along with punitive damages, costs, expenses and reasonable attorney fees along with any and all other relief deemed just, proper and equitable by the Court.

Dated: December 17, 2017
      Valley Stream, New York

                  Respectfully, etc.

                  DONALD N. RIZZUTO, ESQ. (DR7722)