UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
MATTHEW RIZZUTO

                              Matthew,                    17-CV-07381-ILG-ST

-against-

BILL DE BLASIO, Individually and as Mayor of
The City of New York, THE CITY OF NEW YORK,      **DECLARATION OF**
DAVID A. HANSEL, Individually and as                 **STACEY RIZZUTO**
Commissioner, CITY OF NEW YORK
ADMINISTRATION FOR CHILDREN'S
SERVICES, SEYMOUR W. JAMES, JR.,
Individually and as Attorney-In-Chief of The
Legal Aid Society, LEGAL AID SOCIETY,
ROBERT J. MAHON, Individually and as
Executive Director SCO Family of Services,
SCO FAMILY OF SERVICES f/k/a ST.
CHRISTOPHER OTTILIE, SAMUEL ANTUPIT
And LORETTA ANTUPIT

                                    Defendants.
-------------------------------------------------------------------X

       I, STACEY RIZZUTO, declare the following to be true and correct:

1.     At all times herein mentioned I am over the age of eighteen years and the natural mother of the Matthew, Matthew Rizzuto.

2.     I make this declaration in furtherance of my son Matthew's opposition to the collective movants' motion to disqualify Matthew's counsel from representing my son in this action.

3.     I was a named respondent in a case entitled In Re Peter R. involving an abuse petition brought under Docket Numbers: Docket No.'s NA-16123-01 and NA-16124-01 in the Family Court, Queens County, New York. I meaningfully participated in any and all relevant court appearances involved in the underlying fact finding hearings regarding the abuse petition, the dispositional hearing and the termination petition hearing regarding this matter, and, as such, am fully aware of the facts and circumstances enunciated hereinafter.

4.      In early November, 2001, Matthew's 11-month old brother was injured when he was pushed to the kitchen floor by the Matthew. Matthew's father, an attorney, was at work in Nassau County at the time of the incident which I later told Detectives of the New York City Police Department.

5.      I observed no immediate injury or distress in Matthew's brother at the time of the incident.

6.      Being a clinical social worker, I had an upcoming appointment with a patient that morning and brought Matthew to day care and left his brother with the babysitter so as to afford me the opportunity to counsel my patient privately.

7.      After the appointment, I retrieved Matthew's younger brother from the babysitter whose apartment was in the same building as ours. When I arrived, the babysitter pointed out a small lump on his head.

8.      Upon returning to the apartment I called a pediatrician who advised to keep Matthew's brother under observation. Several days later, my husband and I noticed a marked change the size of the lump and brought Matthew to my husband Don's parents house and went directly to the Pediatrician's office, who, directed us to take Matthew's brother to Long Island Jewish Medical Center, Lake Success facility ("LIJ").

9.      At the hospital I was interviewed by Dr. Debra Ersenio Jensen, a staff pediatrician at LIJ who questioned me about the cause of the injury. I explained that I see Matthew's brother fall many times each day due to his learning to walk and initially explained I did not initially recall which fall could have caused the injury. As such I conveyed several falls I noticed the past week.

10. Only later did I connect the kitchen floor incident several days before. A City of New York, Administration for Children's Services case worker was dispatched to investigate.

11. Prior to filing the Petition my husband and I were instructed to leave Matthew with his grandparents and that he should not return home. Matthew's brother was the subject of a "Social Hold" by LIJ during this time despite receiving no treatment of his injury at any time.

12. Approximately one (1) week after the commencement of the investigation, a Petition for Child Abuse was brought against Matthew's parents who had no prior history of drug, alcohol, child or spousal abuse. At the intake hearing, Matthew and his brother were remanded to the custody of the City of New York.

13. A fact finding hearing on the Abuse Petition was commenced in January, 2002. The Family Court in the interim ordered my husband and I to undergo Family Therapy and Parenting Skills classes which were completed to the satisfaction of the Court.

14. Following the testimony of two pediatric neurosurgeons who found no indications of abuse and the testimony of Dr. Ersenio-Jennsen, who was found unqualified to render any opinion regarding skull fraction based determinations of child abuse. With expert opinion testimony founded upon my description of the various falls undertaken by Matthew's brother, the Family Court found no indicia of abuse and dismissed the Petition in or about November, 2003. The corporate defendants immediately appealed.

15. In December, 2003 the appeal was filed with the Supreme Court of the State of New York, Appellate Division, Second Department seeking to overturn the decision of the Family Court. In or about July, 2004 the Appellate Division reversed the Family Court decision entering a finding of "abuse **and/or** neglect" against my husband and I with Matthew found to be Derivatively Neglected remanding the case to the Family Court for a Dispositional Hearing.

16. In or about September, 2004 a permanency proceeding was convened with the enunciated goal of returning the Matthew to the custody and care of his parents as agreed by all the corporate defendants and adopted by the Family Court.

17. Simultaneously, as is the policy of defendant City of New York, the corporate defendants filed a petition to terminate the Matthew's parents parental rights based solely upon Matthew being in foster care twelve of the prior fifteen months regardless of merit with the goal of terminating our parental rights.

18. After a protracted fact finding hearing, this Termination Petition was found baseless and dismissed in July, 2010, taking nearly six years to complete alongside the Dispositional Proceedings. My husband and I were also ordered to undergo individual "insight oriented" therapy which we each faithfully continued from 2004 through 2006 to the complete satisfaction of the Family Court.

19. Between August, 2002 and July, 2010 all case worker reports noted positive interaction between the Matthew and his parents. All therapy interim reports by their private therapists noted my husband and I to be well adjusted, stable individuals and capable parents. All Matthew's therapy reports noted no harm to the Matthew by interacting with either or both of us.

20. My parents never had a positive view of my husband at any time and were particularly angry at him and me for our interfaith marriage.

21. This animosity was preyed upon by all defendants to achieve their goal of permanently placing Matthew with the Antupit defendants despite the objective of the Family Court remaining to return Matthew to the custody and care of me and my husband.

22. Initially, in only one interview each, the Court psychologist diagnosed my husband with Narcissistic Personality Disorder and I was diagnosed as Co-Dependant. This was the basis of

continued placement of Matthew in foster care. However, in conjunction with our therapy ordered by the court premised on his findings, both my husband and I undertook an objective test widely used to determine personality disorders called a Minnesota Multi-Phasic Personality Inventory ("MMPI") which rebuked his assessment of each of us at the early stages of the Dispositional hearing.

23. My husband and I were next ordered at the commencement of the Dispositional Hearing to undergo "Insight Oriented Therapy" to be more empathetic of other people's feelings. This had nothing to do with the incident that brought on Family Court intervention but rather was intended to better handle relationships with my parents.

24. Continued animosity between my parents and me and my husband led to seemingly unending therapy and cumulative motion practice engaged in by the Defendants all of which was either denied after hearings or overturned on appeal. The Corporate Defendants engaged in the tactic of obtaining temporary orders and letting them linger by non-appearance of their counsel at Court dates leading to protracted delay of all proceedings.

25. Neither my husband nor I were ever found to be in contempt of any Court order. However, the Family Court made repeated attempts to craft orders to ameliorate the negative interaction between my husband, myself and the Antupit Defendants.

26. My husband and I repeatedly requested Matthew and his brother be moved to the care of my husband's brother, a decorated war veteran, and his family to avoid interacting with the Antupit defendants. All defendants vehemently opposed this request. Only later did we find out that all the defendants in concert perpetrated a fraud on the Family Court and the Appellate Division by knowingly providing material assistance to the Antupit defendants to feloniously obtain U.S. passports for Matthew and his Brother under false pretenses without our permission.

27. The Termination Petition was dismissed as unfounded in July, 2010.

28. The Dispositional Hearing was concluded in July, 2010 resulting in a finding it was in Matthew and his brother's best interests being returned to the custody and care of my husband and me resulting in their return to the family home.

29. Thereafter, the Antupit Defendants brought a Petition for Grandparental Visitation in Family Court, Nassau County, New York. When confronted with the felonious passport applications they withdrew their Petition prior to any hearing being undertaken.

Dated: June 25, 2018
      Valley Stream, New York

_____
STACEY RIZZUTO